# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

STACY ANN SMITH, as trustee
for the heirs and next of kin of
Eric Kirk Kolski,

        Plaintiff,


v.                    **MEMORANDUM OF LAW & ORDER**
                    Civil File No. 11-3421 (MJD/JJG)

CITY OF BROOKLYN PARK,
OFFICER CHAD GLIRBAS,
individually and in his official
capacity, and OFFICER CHARLES
CUDD, individually and in his
official capacity,

        Defendants.

John C. Conard, Law Offices of John C. Conard, Counsel for Plaintiff.

Jon K. Iverson, Stephanie A. Angolkar, and Amanda L. Stubson, Iverson
Reuvers, LLC, Counsel for Defendants.

## I.    INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary

Judgment. [Docket No. 14] The Court heard oral argument on November 16,

2012. For the reasons that follow, the Court grants Defendants' motion.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     The 911 Call

On November 25, 2008, at 6:45 p.m., Pamela Kukowski called 911. (Angolkar Aff., Ex. 1, 911 Tr. 2-5; Enevoldsen Aff., Ex. 17, 911 Audio, Track 2-3; Compl. ¶¶ 9-10.)  Kukowski reported a domestic disturbance involving a gun at the residence she shared with Eric Kolski.  (911 Tr. 2-5; 911 Audio Tracks 2-3.) Kukowski stated that she was hiding in the bathroom because Kolski had a long gun and was threatening to kill her.  (911 Tr. 2-5; 911 Audio Tracks 2-3; Enevoldsen Aff., Ex. 10, Kukowski Statement at 10.)

The Brooklyn Park Police responded to the 911 call and set up a perimeter around the house.  (Compl. ¶¶ 11-12; Enevoldsen Aff., Ex. 1, Eckman Statement at 3; Enevoldsen Aff., Ex. 3, Nordin Statement at 3.)  Defendant Brooklyn Park Police Officer Chad Glirbas made contact with Kolski at the south door to the home and attempted to convince Kolski to exit the house.  (Glirbas Aff., Ex. 1, Glirbas Statement at 4.)  Kolski stood behind the door so that Glirbas could not see the right side of Kolski's body.  (Id.)  Defendant Brooklyn Park Police Officer Charles Cudd, Lieutenant Larry Eckman, Officer Jeremy Halek, and Officer Michael Nordin observed Kolski concealing his right side and right hand.  (Cudd

2

Aff., Ex. 1, Cudd Statement at 4; Eckman Statement at 3; Enevoldsen Aff., Ex. 4, Halek Statement at 3; Nordin Statement at 4.  See also 911 Transcript 35 and 911 Audio Track 59 (officer stating "He's keeping his right hand inside the door.  He just went back in and shut the door.").)

Glirbas tried to negotiate with Kolski to get Kolski to exit the house, but Kolski repeated statements like "I'm not going to jail," "I hurt too bad," and that he wanted to speak with Linda.  (Cudd Statement at 4; Halek Statement at 3, Nordin Statement at 3.)  Glirbas told Kolski that he had not gone to jail the last time the police were at his house and that the police just needed him to step out and talk to them.  (Glirbas Statement at 4.)  Kolski told the police, "You're going to have to come in here and get me."  (Halek Statement at 3.)  Kolski then shut the door and went back inside the house.  (Id.; Glirbas Statement at 4; Cudd Statement at 4.)

On the 911 call, Kukowski told the dispatcher that Kolski was trying to kick down the bathroom door.  (911 Transcript. 8; 911 Audio Track 9.)  Dispatch relayed this information to the officers.  (911 Transcript. 8; 911 Audio Track 10.)

Kukowski stated that she was afraid that Kolski would shoot through the bathroom door.  (911 Transcript 13; 911 Audio Track 21.)  Once Kolski realized

3

the police were at the house, he told Kukowski: "If they f***ing knock on my door, I'm f***ing coming in there, and I'll f***ing (inaudible)." (911 Transcript 17; 911 Audio Track 31.) He then yelled, "I will not go to f***ing jail. I will not go to f***ing jail. Mother f***er, you're full of sh**. (inaudible)." (911 Transcript. 18; 911 Audio Track 34.) The dispatcher told the police that Kolski told Kukowski that "he's not going to jail because of [her]." (911 Transcript 18; 911 Audio Track 37.) Later, Kukowski began screaming, while still on the 911 call, and yelling at Kolski to put the gun away and to get his "arm out of there." (911 Transcript 25-26; 911 Audio Track 47.) Kolski repeatedly asked her if she called the police, and she repeatedly told him to put the gun away. (Id.) Kolski then said "You're done." (911 Transcript. 26; 911 Audio Track 47.) Next, Kolski continued to yell, "Let me in this door." (911 Transcript 27; Audio Track 47.)

Dispatch told the police that Kolski still had the gun, that Kukowski repeatedly told Kolski to put the gun away, and that he kept asking her if she called the police. (911 Audio Track 48; 911 Transcript 27.) Kukowski told dispatch that she was afraid that he would shoot through the bathroom door. (911 Transcript 28-30; 911 Audio Track 51.)

Kolski tried to kick the door in and Kukowksi was screaming. (911 Transcript 36-37; 911 Audio, Track 62.) Dispatch told the police that Kolski was trying to kick the door down. (911 Transcript 40; 911 Audio Track 64.) Kukowski told dispatch that Kolski was walking around outside the bathroom and the lock on the door no longer worked – she was blocking the door with her legs. (911 Transcript 37-38; 911 Audio, Track 62.) Dispatch told the police that Kukowski could hear him walking around outside the bathroom. (911 Transcript 41; 911 Audio Track 66.)

The police officers could hear noises that sounded like Kolski trying to kick the bathroom door in and Kukowski screaming. (See, e.g., 911 Audio, Track 62; Enevoldsen Aff., Ex. 8, Hjelm Statement at 3-4.) The officers decided that they needed to get inside the house immediately because Kukowski's life was in danger. (Glirbas Statement at 4; Eckman Statement at 4; Nordin Statement at 4.)

Eckman and Nordin tried to use tools to enter through the door, but were unsuccessful. (Eckman Statement at 5; Nordin Statement at 4-5.) They broke the glass in the door, but they could not reach through to unlock it because of items barricading the door. (Nordin Statement at 5; Glirbas Statement at 4.) The

officers then kicked in the door.  (Glirbas Statement at 4; Eckman Statement at 5.)

Cudd entered the house first, followed by Glirbas.  (Id.)

Cudd entered the house with a barricade in his left hand and his MP-5

semi-automatic machine gun in his right hand.  (Glirbas Statement at 4; Cudd

Statement at 4.)  Glirbas entered behind him, also carrying an MP-5.  (Glirbas

Statement at 4-5.)  Eckman, Sergeant Marcus Erickson, Nordin, Halek, and

Officer Rielly Nordan entered next, with their guns drawn.  (Eckman Statement

at 5; Enevoldsen, Ex. 2, Erickson Statement at 4; Nordin Statement at 5; Halek

Statement at 3; Enevoldsen, Ex. 5, Nordan Statement at 4.)  The officers shouted

"Police."  (Glirbas Statement at 5; Cudd Statement at 4; Eckman Statement at 6;

Nordin Statement at 5; Halek Statement at 3; Nordan Statement at 4.)  Someone

yelled something like "come out with your hands up" or "show your hands."

(Cudd Statement at 4; Nordin Statement at 5; Nordan Statement at 4.)  Kukowski

told the 911 operator that she heard the officers instruct Kolski to "get down on

your hands."  (911 Transcript 39; 911 Audio Track 62.)

Cudd heard no response from Kolski.  (Cudd Statement at 4.)  The house

was dark and there were items everywhere, so it was difficult for the police to

move.  (Glirbas Statement at 5; Cudd Statement at 5; Erickson Statement at 4;

Halek Statement at 4.)  The officers entered into the kitchen, and the doorway

from the kitchen to the living room was open when the officers entered.

(Enevoldsen Aff., Ex. 20, Crime Scene Photograph.)  Cudd tripped over items as

he entered the kitchen adjacent to the living room and, as he tripped, he saw a

face.  (Cudd Statement at 5.)  Cudd dropped the barricade and turned on the

flashlight on his gun to illuminate the living room and saw Kolski leaning on the

couch with a shotgun raised and pointed at the police officers.  (Cudd Statement

at 5; Glirbas Statement at 5.)  Cudd yelled, "He's got a gun!" and fired his

weapon at Kolski, because he believed that Kolski would kill him or other

officers.  (Cudd Statement at 5.)  Glirbas was second in the door and a few feet to

the left of Cudd when he heard Cudd yell, "He has a gun!"  (Glirbas Statement at

5.)  Glirbas also turned on the flashlight on his MP5 semi-automatic machine gun

and saw a male sitting on the couch with a gun in a raised position aimed at the

officers.  (Glirbas Statement at 5.)  Glirbas believed that Kolski was going to shoot

him or Cudd, so Glirbas fired his gun at Kolski.  (Id.)  Kolski was shot at 7:15

p.m.  (911 Transcript 41; 911 Audio Track 67.)  Glirbas then approached Kolski

and took his shotgun away, setting the shotgun to his left on either a chair or

couch.  (Glirbas Statement at 6; Eckman Statement at 7; Erickson Statement at 4.)

Smith alleges that Kolski was in his living room "fully illuminated and unarmed." (Compl. ¶ 30.) There is no evidence to support this allegation. Eckman stated that the lights were off in the kitchen, where the police made entry, but on in the living room. (Eckman Statement at 6.) Initially, his view was blocked by Glirbas, so he could not see whether Kolski was armed. (Id.) He further stated that he heard officers yell "gun, gun. Drop the gun." (Id.) Then he heard gunshots. (Id.) After the shots were fired, Eckman had a full view of Kolski and could see that he was on the couch, armed with a shotgun next to him with the barrel pointed towards the police. (Id. at 6-7.)

Halek then handcuffed Kolski behind his back as he lay on the couch. (Compl. ¶ 35; Glirbas Statement at 6; Halek Statement at 4.) As Halek rolled Kolski over, Kolski fell onto the floor. (Halek Statement at 4.) Halek checked Kolski's vital signs and found no signs of life. (Id.) He requested a medical bag and asked dispatch to send the paramedics who were staged two blocks away. (Id.) Other officers secured the house and escorted Kukowski out of the bathroom and out of the residence. (Nordan Statement at 4-5; Erickson Statement at 4.) There was a "partial hole near the center of the [bathroom] door." (Eckman Statement at 8.)

Kolski died as a result of the gunshot wounds. (Angolkar Aff., Ex. 2, Autopsy Report at 1.) At the time of his death, he had a .205 blood alcohol level and multiple painkillers in his system. (Autopsy Report at 2.)

Cudd, Glirbas, and other patrol officers were armed with MP-5 semi-automatic weapons. (Cudd Statement at 3; Glirbas Statement at 3; Nordin Statement at 6.) The MP-5s used by patrol officers, such as Cudd and Glirbas, are equipped to fire only one bullet per trigger pull. (Enevoldsen Aff. ¶ 26.)

Kolski suffered 16 or 17 bullet wounds. (Enevoldsen Aff., Ex. 15, Autopsy Follow Up Report at 1-2; Autopsy Report at 5-15.) Cudd fired 14 shots and Glirbas fired 13 shots. (Enevoldsen Aff., Exs. 18-19, Lab Reports.)

On May 21, 2009, a Hennepin County grand jury entered a no bill for Cudd and Glirbas. (Enevoldsen, Ex. 16, No Bill.)

### 2. Investigation after the Shooting

Hennepin County Sheriff's Office Detective Bogenreif arrived to investigate Kolski's death at 8:56 p.m., on November 25, 2008. (Conrad Aff., Ex. 4, Bogenreif Report at 1.) Hennepin County Sheriff's Office Detective Steve Sinclair arrived later that evening. (Conrad Aff., Ex. 5, Sinclair Report.) They took statements from civilians and photographed the officers and their weapons.

(Id.; Bogenreif Report.)  They questioned Halek, Nordan, Erickson, Nordin, and Eckman the following day.  (Conrad Aff., Ex. 6, Phenow Report at 1.)  They interviewed Glirbas and Cudd on December 1, 2008.  (Cudd Statement at 1; Glirbas Statement at 1.)

A 20-gauge shotgun was recovered from Kolski's home, photographed at the scene, and taken to the Hennepin County Crime Laboratory.  (Conrad Aff., Ex. 7, Hennepin County Firearm Report.)

### B. Procedural History

On November 22, 2011, Smith filed a lawsuit in this Court against the City of Brooklyn Park ("the City"), Glirbas, and Cudd.  The Complaint alleges: Count One: Violation of 42 U.S.C. § 1983 (against all Defendants); Count Two: 42 U.S.C. § 1983 Violations by Defendant Brooklyn Park; Count Three: Violation of 42 U.S.C. § 1985 (against all Defendants); Count Four: Assault and Battery by Defendants Glirbas and Cudd; Count Five: Negligence by Defendants Glirbas and Cudd; Count Six: Negligence by Defendant Brooklyn Park; and Count Seven: Respondeat Superior (against the City).  Defendants now move for summary judgment on all claims based on qualified immunity and official immunity.

Just before the Court heard oral argument, Plaintiff filed a motion to supplement her opposition to the summary judgment motion and submitted a preliminary expert report.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### B.    Plaintiff's Motion to Supplement

On November 9, 2012, Plaintiff filed a letter request to supplement her response to the summary judgment motion with a preliminary report from Plaintiff's newly hired expert, W. Ken Katsaris.  Katsaris is a law enforcement

instructor and consultant from Florida who opines that Kolski was not holding the shotgun at the time he was shot.  (Katsaris Preliminary Report at 8.)

The Court denies Plaintiff's request to supplement the record.  Plaintiff's opposition to the summary judgment motion was due on August 8, 2012, more than 3 months before she filed the instant request to supplement.  Additionally, Plaintiff did not object to staying discovery pending the outcome of Defendant's current motion for summary judgment, and an order staying discovery was entered on August 3, 2012.  Allowing supplementation would prejudice Defendants, who would not have the opportunity to obtain their own expert report.  The Court will disregard the Katsaris Preliminary Report.  Moreover, the Court notes that, even if it had considered the Report, which contains no new facts but only Katsaris's interpretation of the current record, the outcome would be the same.

## C.    Discovery

Plaintiff asserts that the current record is incomplete because discovery was stayed during the pendency of this motion.  The Court rejects this argument.

> Qualified immunity is an immunity from suit, not simply from liability.  Its purpose is to avoid subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery in cases where the legal norms the officials are alleged to have violated were not clearly established at the time.  Accordingly,

> [u]nless the plaintiff's allegations state a claim of violation of clearly
> established law, a defendant pleading qualified immunity is entitled
> to dismissal before commencement of discovery.

Janis v. Biesheuvel, 428 F.3d 795, 800 (8th Cir. 2005) (citations omitted).  As in

Janis, discovery is not warranted in this case because Plaintiff cannot show what

pertinent information might be revealed by discovery, "particularly in light of

the affidavits and supporting materials previously submitted and the death of

[the alleged victim]."  Id. at 801.

Additionally, Plaintiff has not filed an affidavit showing what relevant

facts further discovery might uncover.  See Fed. R. Civ. P. 56(d).  "Discovery does

not need to be complete before a district court grants summary judgment.

Unless a party files an affidavit under Federal Rule of Civil Procedure 56(f)

showing what facts further discovery may uncover, a district court generally

does not abuse its discretion in granting summary judgment on the basis of the

record before it."  Ballard v. Heineman, 548 F.3d 1132, 1136-37 (8th Cir. 2008)

(citations omitted).  Plaintiff did not oppose Defendants' Motion to Stay

Discovery.  Plaintiff cannot now avoid summary judgment by claiming an

insufficient opportunity to conduct discovery.

### D.      Qualified Immunity

### 1.    Qualified Immunity Standard

"The purpose of qualified immunity is to allow public officers to carry out their duties as they believe are correct and consistent with good public policy, rather than acting out of fear for their own personal financial well being." <u>Sparr v. Ward</u>, 306 F.3d 589, 593 (8th Cir. 2002) (citation omitted). "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. The privilege is an <u>immunity from suit</u> rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." <u>Saucier v. Katz</u>, 533 U.S. 194, 200-01 (2001) (citations omitted), <u>overruled in part on other grounds by</u> <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009). Therefore, immunity questions should be resolved "at the earliest possible stage in litigation." <u>Id.</u> at 201 (citation omitted).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson</u>, 555 U.S. at 231 (citation omitted). "Evaluating a claim of qualified immunity requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged

misconduct." Estate of Morgan v. Cook, 686 F.3d 494, 496 (8th Cir. 2012) (citation omitted).

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Hope v. Pelzer, 536 U.S. 730, 739 (2002) (citations omitted).

When bringing a section 1983 claim a plaintiff must establish (1) that he was deprived of a right secured by the Constitution or laws of the United States and (2) that the deprivation was committed under color of state law. Lugar v. Edmondson Oil Co., 457 U.S. 922, 931 (1982). Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989) (citation omitted).

## 2.     Standard for Excessive Force

"All claims that law enforcement officials used excessive force—deadly or not—in the course of making an arrest or other 'seizure' of a free citizen are properly analyzed under the Fourth Amendment." Cole v. Bone, 993 F.2d 1328, 1332 (8th Cir. 1993) (citation omitted). "Apprehension by the use of deadly force

is a seizure subject to the reasonableness requirement of the Fourth Amendment. The use of deadly force is not constitutionally unreasonable if an officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." Nance v. Sammis, 586 F.3d 604, 610 (8th Cir. 2009) (citations omitted). "The key question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. (citation omitted).

> The reasonableness of an officer's use of force is evaluated by looking at the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight.

Id. (citation omitted).

### 3. Whether the Officers' Actions Were Objectively Reasonable

If a suspect is pointing a gun at officers, then the use of deadly force is reasonable. See, e.g., Sinclair v. City of Des Moines, 268 F.3d 594, 596 (8th Cir. 2001) (upholding conclusion that "no constitutional or statutory right exists that would prohibit a police officer from using deadly force when faced with an apparently loaded weapon").

From Cudd and Glirbas's perspective, they knew when they entered Kolski's home that he was an armed domestic assault suspect who, they reasonably believed, was going to kill or injure Kukowski, who was trapped in the bathroom by Kolski. They knew he was yelling, threatening Kukowski, and trying to break down the door to the bathroom where she was hiding. They knew that Kolski was aware that there were police present because he had talked to officers at his door. He rebuffed police entreaties to come out of the house. Also, Kolski had stated that the police would have to come in and get him. Kolski was aware that police had entered his house because they loudly broke open the door and, as they entered, police officers repeatedly announced "police." Officers were forced to try and find an armed suspect while entering into a dark room, crowded with obstacles. The crime scene photographs show that Cudd and Glirbas were close to the living room where Kolski sat on the couch with his shotgun. The testimony of every witness to the event was that Kolski had a weapon aimed at the officers. Cudd warned officers that Kolski had a gun and shot Kolski because he thought that Kolski was going to shoot him or other officers. Glirbas shot Kolski because he thought Kolski was going to shoot

him or Cudd. Cudd and Glirbas reasonably feared for their lives and the lives of the other officers.

Smith argues that Kolski was unarmed, fully illuminated, and had his hands up when he was shot. However, there is no evidence to support this claim, and Plaintiff cannot show what pertinent information that might be revealed by discovery that would support this claim.

Eckman's statements do not support Plaintiff's argument. Eckman testified that, when he initially encountered Kolski, Kolski was on the living room couch, but, because Glirbas and Cudd were ahead of Eckman and Glirbas was blocking Eckman's view, Eckman could "only see his body from his knees down" and could not see if he was armed. (Eckman Statement at 6.) However, he further testified that Glirbas and Cudd were yelling "gun, gun. Drop the gun." (Id.) Then, after they shot Kolski, Eckman moved so he had a full view of Kolski on the couch and he could see that Kolski was armed with a shotgun that "was next to him with the barrel pointed in our direction." (Id. at 6-7.) Eckman explicitly confirms that Kolski was armed. He also states, consistent with Glirbas and Cudd, that Kolski was on the living room couch and another officer yelled out that Kolski had a gun. The only discrepancy between Eckman's statement

and the statements of other officers is that, while Eckman confirmed that the police entered into a dark house, he also recalled that the lights were on in the living room. This detail does not change the analysis of the reasonableness of the officers' actions.

Nor does the report of Hennepin County Sheriff's Office Firearm Examiner, Rick Boelter, which provides no physical description of Kolski's shotgun, support Plaintiff's claim. (Conard Aff., Ex. 7, Hennepin County Firearm Report at 2-3.) Also, the crime scene photographs of Kolski's shotgun do depict a red substance on the stock of the gun. (Conard Aff., Ex. 2, Crime Scene Photographs at 3-9.) The physical evidence does not establish a genuine issue of material fact as to whether Kolski was armed.

There is no evidence in the record that Kolski was unarmed when he was killed. Glirbas and Cudd both advised that, after entering Kolski's home, they saw Kolski sitting on a couch in the living room, pointing a shotgun in Cudd's direction. An officer is permitted to use deadly force when he is confronted with a suspect pointing a gun at him. Plaintiff cannot create a fact dispute simply by attacking the officers' credibility. See Thompson v. Hubbard, 257 F.3d 896, 899 (8th Cir. 2001) (holding that qualified immunity applied when the officer's "use

of force, as he describes it, was within the bounds of the Fourth Amendment, and all of the evidence presented to the district court is consistent with that account" and noting that "[t]he plaintiffs may not stave off summary judgment armed with only the hope that the jury might disbelieve witnesses' testimony").

The information known to Defendants when they entered the home was based on undisputed radio traffic that repeatedly reported that Kolski was armed and threatening to kill Kukowski. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). The audio clearly depicts a tense, hostile, and rapidly evolving situation, in which Cudd and Glirbas were reasonable to fear for their safety and for the safety of Kukowski.

This case is similar to Janis v. Biesheuvel, 428 F.3d 795 (8th Cir. 2005), in which the alleged victim of excessive force was also deceased and there were no witnesses other than the officers. In Janis, the Eighth Circuit upheld the grant of qualified immunity before the requested discovery. The plaintiff already had the

> police reports of the incident, a transcript of the radio traffic between
> a highway patrol trooper who was involved in the pursuit and the

dispatcher, and the daily activity report from the Fall River County Dispatcher. [The plaintiff] also had affidavits from both officers involved in removing [the decedent] from his vehicle. Finally, [the plaintiff] had a videotape from one of the officers' vehicles that provided a partially obstructed view of the events that transpired when [the decedent] was pulled over.

Id. at 801. The Eighth Circuit concluded that discovery was not warranted in Janis because the plaintiff could not show what pertinent information might be revealed by discovery, "particularly in light of the affidavits and supporting materials previously submitted and the death of [the alleged victim]." Id. at 801.

Here, Plaintiff has the audio and transcript of Kukowski's 911 call throughout the incident, the radio traffic for the officers, the autopsy report, crime scene photos, an extensive witness statement from Kukowski, and police statements. As in Janis, the alleged victim, Kolski, is deceased and there are no other witness to the incident besides the officers and Kukowski. There is no basis for Plaintiff to allege that Kolski was unarmed when every witness testified that he was armed or that they could not see him; the 911 call, radio traffic, and Kukowski's interview clearly indicate that he was armed and threatening violence; and the crime scene photographs document his firearm near where he was killed.

Viewing the facts in the light most favorable to Plaintiff, it is inescapable

that the officers had probable cause to believe that Kolski posed a threat of

serious physical harm to the officer or others.  Qualified immunity applies.

### E.    <u>Monell</u> Claim

Smith asserts that the City had a pattern or practice of "unjustified,

unreasonable and illegal uses of excessive force with respect to the use of

automatic weapons."  (Compl. ¶ 54.)  She also asserts a failure to train or

discipline claim regarding the use of automatic weapons.  (<u>Id.</u> ¶ 55.)  She asserts

that there is a custom and practice of deliberate indifference to excessive force.

(<u>Id.</u> ¶ 56.)  Further, she claims that the City should have disciplined the officers,

but did not.  (<u>Id.</u> ¶ 46.)

> A municipality or other local government may be liable under [§
> 1983] if the governmental body itself 'subjects' a person to a
> deprivation of rights or 'causes' a person 'to be subjected' to such
> deprivation.  But, under § 1983, local governments are responsible
> only for their <u>own</u> illegal acts.  They are not vicariously liable under
> § 1983 for their employees' actions.

<u>Connick v. Thompson</u>, 131 S. Ct. 1350, 1359 (2011) (citations omitted).

> [The Eighth] [C]ircuit has consistently recognized a general rule
> that, in order for municipal liability to attach, individual liability
> first must be found on an underlying substantive claim.  Similarly,
> to maintain an action for training or supervisory liability, a plaintiff
> must show the failure to train or supervise caused the injury.

<u>Moore v. City of Desloge, Mo.</u>, 647 F.3d 841, 849 (8th Cir. 2011) (citations

omitted).  Because Plaintiff cannot establish that Glirbas or Cudd violated

Kolski's constitutional rights, the City is not subject to <u>Monell</u> liability.

**F.      Section 1985 Conspiracy Claim**

In Count Three, Plaintiff asserts a conspiracy claim under § 1985 based on

a conspiracy of

> engaging in and consenting to: assault and battery of Decedent; the
> failure to intervene and prevent known and observed civil rights
> violations; the failure to come to the assistance of a citizen in need of
> protection; the attempt to hide such conduct; and other violations of
> Decedent's civil rights as described above.

(Compl. ¶ 59.)

A § 1985(3) claim requires that the conspiracy be "motivated by some

racial, or perhaps otherwise class-based, invidiously discriminatory animus."

<u>United Bhd. v. Scott</u>, 463 U.S. 825, 829 (1983); <u>Bell v. Fowler</u>, 99 F.3d 262, 270 (8th

Cir. 1996) (same).  Here, there is no evidence of class-based invidiously

discriminatory animus.  Kolski was a white male.  (Autopsy Report at 3.)  Smith

has not alleged that deadly force was employed against him because of his

gender or race or for any other discriminatory reason.  Count Three is dismissed.

**G.      Official Immunity**

Official immunity bars the state law claims of assault and battery and negligence against Cudd and Glirbas in Counts Four and Five and of respondeat superior liability against the City in Count Seven.

### 1. Official Immunity Standard

Under Minnesota's official immunity doctrine, "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." Elwood v. Rice County, 423 N.W.2d 671, 677 (Minn. 1988) (citations omitted). The Court uses a two-step inquiry to determine whether official immunity is available to an officer: "(1) whether the alleged acts are discretionary or ministerial; and (2) whether the alleged acts, even though of the type covered by official immunity, were malicious or willful and therefore stripped of the immunity's protection." Dokman v. County of Hennepin, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001).

Whether an act is discretionary is determined by the court as a matter of law. Kelly v. City of Minneapolis, 598 N.W.2d 657, 664 n.5 (Minn. 1999). "Under Minnesota law, the decision to use deadly force is a discretionary decision entitling a police officer to official immunity absent a willful or malicious

wrong." <u>Hayek v. City of St. Paul</u>, 488 F.3d 1049, 1056 (8th Cir. 2007) (citing

<u>Maras v. City of Brainerd</u>, 502 N.W.2d 69, 77 (Minn. Ct. App. 1993)).

> [I]n determining whether an official has committed a malicious
> wrong, the fact finder considers whether the official has
> intentionally committed an act that he or she had reason to believe is
> prohibited.  [This] standard contemplates less of a subjective inquiry
> into malice, which was traditionally favored at common law, and
> more of an objective inquiry into the legal reasonableness of an
> official's actions.

<u>State by Beaulieu v. City of Mounds View</u>, 518 N.W.2d 567, 571 (Minn. 1994)

(citations omitted).

### 2.  Discussion of Official Immunity

Glirbas and Cudd were discretionary actors when they used deadly force

against Kolski.  As the Court discussed with regard to the issue of qualified

immunity, there is no evidence that Cudd or Glirbas acted willfully and

maliciously.  They acted reasonably in response to a significant threat of death or

physical injury.  Official immunity applies, and Plaintiff's claims for assault,

battery, and negligence against Glirbas and Cudd are dismissed.

### 3.  Vicarious Official Immunity

"Vicarious official immunity protects a governmental entity from liability

based on the acts of an employee who is entitled to official immunity."  <u>Dokman</u>

v. County of Hennepin, 637 N.W.2d 286, 297 (Minn. Ct. App. 2011).  Because

official immunity applies to Glirbas and Cudd, vicarious official immunity

applies to Plaintiff's respondeat superior claim against the City.  See Watson by

Hanson v. Metro. Transit Comm'n, 553 N.W.2d 406, 414 (Minn. 1996) ("If official

immunity protects the government employee, . . . from suit, the government

entity will not be liable for its employee's torts under the statute or under

common law respondeat superior.").

H.      Statutory Immunity

Statutory immunity bars Plaintiff's claim for negligent training, discipline,

supervision, and retention against the City, Count Six.  A municipality is

protected by "statutory immunity" for "[a]ny claim based upon the performance

or the failure to exercise or perform a discretionary function or duty, whether or

not the discretion is abused."  Minn. Stat. § 466.03, subd. 6.

> Statutory immunity exists to prevent the courts from conducting an
> after-the-fact review which second-guesses certain policy-making
> activities that are legislative or executive in nature.  If a
> governmental decision involves the type of political, social and
> economic considerations that lie at the center of discretionary action,
> including consideration of safety issues, financial burdens, and
> possible legal consequences, it is not the role of the courts to second-
> guess such policy decisions.  In determining what constitutes a
> discretionary function, this court has drawn a distinction between
> 'planning level' conduct, which is protected by immunity, and
> 'operational level' conduct, which is not protected.

<u>Watson by Hanson v. Metro. Transit Comm'n</u>, 553 N.W.2d 406, 412 (Minn. 1996) (citations omitted).

"Hiring, supervising, training, and retaining municipal employees are policy-level activities that are protected by statutory immunity." <u>Fear v. Indep. Sch. Dist. 911</u>, 634 N.W.2d 204, 212 (Minn. Ct. App. 2001) (citation omitted). <u>See also</u> <u>Hassan v. City of Minneapolis</u>, 489 F.3d 914, 920 (8th Cir. 2007) ("[B]ecause hiring, supervising, and training police officers are policy-level activities, the City, by statute, has discretionary immunity from any tort liability based on negligence.") (citations omitted).

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.    Plaintiff's Letter Request to Supplement the Record [Docket No. 32] is **DENIED**.

2.    Defendants' Motion for Summary Judgment [Docket No. 14] is **GRANTED** and this case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   February 24, 2013          s/ Michael J. Davis
                                    Michael J. Davis
                                    Chief Judge
                                    United States District Court